IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**UNITED STATES OF AMERICA,**

        Plaintiff,

    v.

**DOUGLAS DEANE BUCKLEY,**

        Defendant.

No. 3:10-cr-00328-MO

OPINION AND ORDER

**MOSMAN, J.**,

Douglas Buckley worked as a commodity trading advisor for a small group of clients in

the Portland area.  He was accused of misrepresenting the profits in his clients' accounts in order

to increase his fees.  The jury issued a guilty verdict on two counts of mail fraud and one count

of wire fraud.  Upon review of the post-trial motions, I conclude the government's theory of

misrepresentation was fatally flawed.  It assumed that Buckley's method of calculating fees

1 – OPINION AND ORDER

deviated from an industry-recognized, common-sense understanding of profits and fees, but there is no such understanding.

Accordingly, I GRANT defendant's motion [151] for judgment of acquittal and motion [149] to dismiss the indictment.  In the alternative, I grant defendant's motion [152] for new trial because the trial proceeded in a way that creates for me serious concerns that a miscarriage of justice may have occurred, both because of the government's theory of misrepresentation and also because collateral proof of the misrepresentation involving 404(b) evidence had taken on a different character by the end of trial than what I contemplated when I first ruled on its admissibility.

## BACKGROUND

Mr. Buckley was a commodity trading advisor from November 2005 through December 2009.  He was not registered, nor did the government move forward at trial on a theory that he was required to register.  He had experience trading commodities, but his clients generally did not.

At times between November 2005 and December 2009, Mr. Buckley operated his business as Intuitive Chaos Financial Group ("ICFG") and Intuitive Chaos Trust ("ICT").  His clients each opened an account with R.J. O'Brien & Associates ("RJO"), a trading clearinghouse. Client funds in the RJO accounts were used for buying and selling commodities futures contracts and options.  Mr. Buckley used a registered commodities broker named Robert Martin to make the trades through the clients' accounts at RJO.

Most of Mr. Buckley's clients signed a Trading Advisor Agreement, under which Mr. Buckley would act as a trading advisor for a fee consisting of 30% to 35% "of the total profits of all trading accounts managed by the Trading Advisor on a monthly basis." (Mem. [22] Ex. A. at

1.) To calculate this fee, Mr. Buckley first calculated "total profits." He did so by taking the cash in the account at the end of the month and adding the value of the Treasury bills[1] and then subtracting the cash in the account at the beginning of the month and the value of the Treasury bills. His calculation method also took into consideration any withdrawals or deposits made by the customer. It did not reflect the open option value for the options that were sold. Both Mr. Buckley's attorney and the government's expert described Mr. Buckley's accounting method as a form of cash basis (as opposed to accrual basis) accounting..

At trial, no evidence was presented that that there was an applicable law requiring Mr. Buckley to calculate total profits or his fee using any one specific method. Moreover, there was no allegation or evidence that the values of the cash or Treasury bills that Mr. Buckley used in his calculations were false in any way.

## PROCEDURAL BACKGROUND

The indictment alleges two counts of mail fraud and two counts of wire fraud. Five of Mr. Buckley's clients are identified as victims by their initials: Ms. Sally Cantrell, Mr. Aubrey "Bud" and Ms. Diane Alberding, Mr. William Blakeslee, and Mr. Robert White. The indictment, in relevant part, alleges that "the ICFG and ICT statements of account calculated materially false and inflated monthly profits on the trading accounts that did not reflect the *actual profit realized* on the accounts during the relevant time period." (emphasis added). In addition, the indictment alleges that the "ICFG and ICT statements of account also calculated a 35% or 30% fee based on the materially false and inflated profit, not the *actual profit realized* on the accounts during the relevant time period." (emphasis added). Finally, the indictment alleges that "Defendant's false and materially misleading statements of account caused the investors to

---

[1] According to the government, RJO required each customer to maintain a sufficient equity/cash reserve in his or her account as collateral or "margin" to cover the trades. Typically, Mr. Buckley's customers invested their cash reserve in a Treasury bill to earn additional interest.

wire or send money from their R.J. O'Brien accounts, in order to pay defendant his fees." The indictment does not define "profit," "inflated," or "actual profit realized."

Prior to trial, Mr. Buckley moved [21] to dismiss the indictment on the basis that it failed to set forth a statement of the essential facts constituting the offense charged and, more specifically, that it failed to adequately describe any fraudulent misrepresentation that he purportedly made. With the exception of a limited excision from the indictment to which the government agreed, I denied [45] that motion. The government agreed to strike paragraph 2(c) of the indictment, which states, "[d]efendant held himself out as a commodity trading advisor to the public and to his investors, even though he was not a registered commodity trading advisor." Once this was stricken, regulatory requirements regarding registered and exempt commodity trading advisors were irrelevant.

During trial, defendant moved pursuant to Rule 29 to dismiss all four counts in the indictment based upon insufficiency of the evidence. Among other arguments, he asserted that there was no evidence of any promise made that profits would be based on actual profit realized. The government responded that the Trading Advisor Agreement stated that clients would be charged based on total profits, that people have a common understanding of "profit," and that the total profits amount that Mr. Buckley calculated did not match that common understanding. I denied the motion. However, I informed the parties that the "motion raise[d] very serious issues about the nature of the Government's theory in this case" and that I would take a "close look at it post-trial, if that [became] necessary." (Tr. [168] at 512.)

The case went to the jury and the jury returned a verdict of guilty on Counts 1, 2, and 4 of the indictment, and not guilty on Count 3, the wire fraud count involving Ms. Sally Cantrell.

After trial, defendant moved [149] to dismiss the indictment for failure to state a claim,

moved [151] for judgment of acquittal, and moved [152] for a new trial.  Initially, I denied [186]

those motions.  After *sua sponte* reconsideration of those motions, I held a hearing and granted

them from the bench, indicating that this opinion would follow.

## DISCUSSION

I.       **Judgment of Acquittal**

     A.      *Legal Standard*

"A motion for Judgment of Acquittal is reviewed on a sufficiency-of-the-evidence

standard."  *United States v. Stoddard*, 150 F.3d 1140, 1144 (9th Cir. 1998).  Under that standard,

"the relevant question is whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt."  *United States v. Riggins*, 40 F.3d 1055, 1057 (9th Cir. 1994).

 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  To overturn a jury's conviction, the

court "must conclude that, viewing the facts in the light most favorable to the government, 'the

government's proof was insufficient as a matter of law to constitute a crime.'"  *United States v.

Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010) (quoting *United States v. Moore*, 84 F.3d 1567, 1568

(9th Cir. 1996)).  The court's conclusion "is a judgment as a matter of law."  *Id.*

     B.      *Analysis*

At trial, he government tried to make what everyone agreed was very complicated very

simple. But this is not a simple case of fraud.  In the typical fraud case, the definitions of terms

essential to the theory of fraud have much less importance.  If a defendant told investors, "I will

use your money to purchase cattle," *see United States v. Hoyt*, 2006 WL 1491574,  at *1 (D. Or.

May 23, 2006), or "invest in the market," *see S.E.C. v. Rhodes*, 2009 WL 1227774, at *1 (D. Or.

May 4, 2009), and instead spent the money on personal luxuries or buying off early investors, there would be no lack of clarity.  What he promised, (X), and what he did, (Y), are so different, and so readily understood, as to negate the need for further clarification.  Here, what Mr. Buckley told his investors he would do was "take a 35% fee from total profits" (X).  What he actually did was "take a 35% fee from total profits" (Y).  To distinguish between (X) and (Y) in this situation requires understanding the Government's theory of the proper calculation method for profits.  (X) and (Y) in this situation are neither so dissimilar, nor so commonly understood, as to negate the need for more clarity.

To prove its theory of fraud the government needed to prove a misrepresentation.  The logical chain for finding a misrepresentation in this case required the following steps.  First, there is a common deeply held understanding of the phrase "total profits."  Second, Mr. Buckley significantly varied from that understanding when calculating total profits.  Third, Mr. Buckley was under a duty to explain his novel calculation method.  Finally, Mr. Buckley did not do so. The government's theory of misrepresentation rests in part on a failure to explain his method and in part on the use of a term, "total profits," in a manner that is widely different from the common understanding of the term.

I find there is no common understanding of the term "total profits."  More fundamentally, there was no evidence of a common understanding presented at trial.  The government put forward various definitions of the terms "profit" and "total profits," and those definitions were irreconcilable.  Viewing the facts in the light most favorable to the government, the government's proof was insufficient as a matter of law to establish the crimes charged in the indictment.  To show that what Mr. Buckley did was wrong, the government had to explain what

would have been right.  And there was no consistent theory of what was right—there was no baseline from which Mr. Buckley deviated.

### 1.   Trial Evidence and Arguments

#### a)   The term "Total Profits" in the Indictment

In the indictment, the government alleged that Mr. Buckley's "fee [was] based on the materially false and inflated profit, not the actual profit realized."  Therefore, according to the indictment, profit should mean "actual profit realized."  But it is entirely unclear what the term "actual profit realized" means in the context of commodities trading.  Another problem, not apparent from the face of the indictment, but readily apparent by the end of trial, is that not a single named victim testified that he or she understood "total profits" to mean "actual profit realized."

#### b)   The term "Total Profits" according to Mr. Buckley's clients

Instead of testifying that they understood "total profits" to mean "actual profit realized," some clients explained their understanding of "total profits" as an equation, some testified they were unsure of what it meant, and at least one client agreed it meant other terms such as "real profit" or "actual profit."   The government elicited testimony from the following clients of Mr. Buckley:  Mr. Gary Engel, Mr. William Blakeslee, Mr. Bud and Ms. Diane Alberding, Ms. Sally Cantrell, and Mr. Robert White.  The government also elicited testimony from Ms. Leesa Wilder and Mr. Josh Kelly, although their involvement with Mr. Buckley was different from the other clients and there was no allegation that he charged them inflated fees based on total profits.

Mr. Engel testified that he discussed the term "total profits" with Mr. Buckley.  Mr. Engel's understanding of the term "total profits" was that it meant "totaling the amount that was in the account one month, totaling it the following month, and the difference was the total

profit." (Tr. [166] at 70.)  On cross, he agreed that Mr. Buckley explained that "total profit

would be measured by TE, or total equity, plus the value of the Treasury bills at the end of the

month, less TE - - total equity - -  plus Treasury bills at the beginning of the month." (*Id.* [166]

at 136.)  He also agreed that Mr. Buckley never made any promises about basing total profits on

net profits, actual profits realized, or actual realized profits.  (*Id.* [166] at 136.)  Mr. Engel

testified that he, not Mr. Buckley, explained the definition of "total profits" to Mr. Blakeslee,

consistent with his understanding of what that term meant.  (*Id.* [166] at 137.)  Mr. Engel

testified further that Mr. Blakeslee "didn't understand it either, but he accepted it." (*Id.* [166].)

Mr. Blakeslee, however, testified that Mr. Engel did not discuss with him the clauses that

concerned total profits and the fee arrangement.  (Blakeslee Dep. at 54.)  When asked to define

his understanding of total profits as used in the agreement, he stated "Profit is usually the

difference between what you've invested and what it costs to manage that investment and if you

invest and there's a gain, so the difference is profit." (*Id.* at 13.)  He also testified that he

believed he could withdraw the profit from his account.  (*Id.* at 20, 26–27.)

Mr. Alberding testified that "[he didn't] understand what the term total profit mean[t]"

explaining that "there's more than one profit." (Tr. [167] at 201.)  Ms. Alberding testified that

she "didn't understand any of this." (*Id.* [167] at 223.)

Unlike some of the other clients, Ms. Cantrell did not enter into a written contract with

Mr. Buckley.  However, Ms. Cantrell and Mr. Buckley agreed that she would pay the same fee as

other investors.  When asked to explain her understanding of that agreement, she stated, "[I]t was

confusing.  The highest - - however much was made above the highest previous month, and 35

percent of that, but then it should be the - - the gains." (*Id.* [167] at 328.)

8 – OPINION AND ORDER

Mr. White testified that his understanding of the phrase "total profits" in the agreement meant "that whatever you started with and whatever you ended with, the profit would be in there." (Tr. [168] at 486.)  When asked again on cross, he explained, "The way I was taught about profit is what's left from the end of the month, from the beginning to the end.  That's how you calculate profit in my little world." (*Id.* [168] at 516.)  On redirect, the government and Mr. White engaged in the following exchange:

> Government:  Mr. White, did you interpret, when you read the trading advisor agreement, did you interpret "total profit" to mean real profit?
>
> Mr. White:  Yeah.  I mean in my little world, that's what that means.
>
> Government:  Or actual profit?
>
> Mr. White:  Yeah, exactly.

(*Id.* [168] at 518.)

During closing, the government argued that Mr. Buckley's clients "had the understanding, as I think Mr. Blakeslee put it well, that it was real profit, and the best way - - what they could draw on out of that account." (*Id.* [168] at 541.)

c)       **The term "total profits" according to the Government's Expert**

Mr. Jason Tanner, the government's expert, expressed a different standard from which Mr. Buckley was said to have deviated—a form of accrual method of accounting that is used in the commodities trading industry.

In preparation for trial, Mr. Tanner reviewed the monthly and daily statements from RJO and the monthly statements from Intuitive Chaos relating to the Alberdings, Mr. Blakeslee, Ms. Cantrell, and Mr. White. (Tr. [167] at 238–39.)  Mr. Tanner also reviewed their Trading Advisor Agreements, with the exception of Ms. Cantrell, who did not enter into a written agreement with Mr. Buckley. (*Id.* [167] at 239.)

9 – OPINION AND ORDER

Mr. Tanner explained that Mr. Buckley calculated profits by taking the cash in the account at the end of the month and adding the value of the Treasury bills and then subtracting the cash in the account at the beginning of the month and value of the Treasury bills. (*Id.* [167] at 292–93.) In addition, Mr. Buckley's calculation took into consideration any withdrawals or deposits made by the customer. (*Id.* [167].) He characterized Mr. Buckley's accounting for options as the cash basis method. (*Id.* [167] at 292.)

Mr. Tanner had calculated profits using the accrual method, explaining that it was the industry standard and was compliant with Generally Accepted Accounting Principles. (*Id.* [167] at 242.) He testified that, in his opinion, Mr. Buckley's profit calculations were "grossly inaccurate" and "much, much too high." (*Id.* [167] at 241.) He further testified that the "grossly inflated profits led to grossly inflated incentive fees being charged to [Mr. Buckley's] customers." (*Id.* [167] at 241.)

Mr. Tanner explained that Mr. Buckley's profit calculations were wrong because he "did not include the open option value for the options that were sold." (*Id.* [167] at 273.) According to Mr. Tanner, when an option is sold, cash is collected, but there is also a corresponding liability. The liability was not included in Mr. Buckley's calculation of profits. (*Id.* [167] at 273–74.) That was the "key thing that [made] his profit calculations false." (*Id.* [167] at 275.) On cross-examination, he further explained that the liability number is volatile. (*Id.* [167] at 297.) Nevertheless, under Mr. Tanner's method, a number representing the liability is used and that number allows for a snapshot in time of what the account would be worth if liquidated. (*Id.* [167] at 297–98.)

When Mr. Tanner was asked whether "total profit" means the same thing as "gross profit" he answered, "To be blunt, the term 'total profit,' once again, it is a term that's in here

[the Trading Advisor Agreement], and it's not an industry kind of standard term.  I think the term 'profit' most certainly - - I think we can all understand what 'profit' is, but in this context, I'm not sure what the term 'total profit' is meant to imply."  (*Id.* [167] at 299.)

### 2.    Analysis

The baseline for "total profits" derived from the customers' testimony and the baseline derived from the government expert's testimony are irreconcilable.  The government conceded this point post-trial, although they argued it did not matter. (Tr. [211] at 22–25.)  In my view, irreconcilable baselines matter.  Some of the jurors could have decided that the misrepresentation was that Mr. Buckley did not follow what the customers thought[2] he meant by the words in their contracts, and other jurors could have decided that Mr. Buckley's misrepresentation was that he did not calculate profits using the industry standard accrual method of accounting described by Mr. Tanner.  What is more, both of these theories vary from the language in the indictment, as presented to the grand jury.

### a)    No regulatory issue

By the time this case went to trial, there was no regulatory issue.  At the time of the indictment, however, that was far from obvious.  The indictment reflected a concern with Mr. Buckley's status as a commodity trading advisor who had not registered.  The indictment alleged that Mr. Buckley "held himself out as a commodity trading advisor to the public and to his victims, even though he was not a registered commodity trading advisor."

---

[2] As stated previously, the government argued during closing that Mr. Buckley's clients "had the understanding, as I think Mr. Blakeslee put it well, that it was real profit, and the best way - - what they could draw on out of that account."  (Tr. [168] at 541.)    I have serious questions about whether the government's synopsis of Mr. Buckley's clients' understanding of the term "total profits" in closing was accurate.  Mr. Engel's testimony shows that his understanding of Mr. Buckley's calculation method matched the calculation method that Mr. Buckley used and he explained that method to Mr. Blakeslee.  Other clients' testimony shows that they did not know what "total profits" meant.  All of these discrepancies in the clients' understanding intensify the problem with the government's case.

Faced with Mr. Buckley's pretrial motion to dismiss, the government agreed to strike that paragraph on the basis that whether or not Mr. Buckley was required to be registered was immaterial to the scheme to defraud, which, in the government's view, targeted defendant's misrepresentation related to inflated monthly profit figures, and the corresponding inflated fees. As the government later argued in pretrial motions, once that allegation had been stricken, regulatory requirements regarding registered and exempt commodity trading advisors became irrelevant, and any testimony about the regulations would pose a risk of confusing the jury.

Striking the paragraph is significant for two reasons that were explicitly acknowledged by the government. First, only registered commodity trading advisors are required by the United States Commodity Futures Trading Commission ("CFTC") regulations to calculate performance on an accrual basis of accounting in accordance with Generally Accepted Accounting Principles. Second, unlike registered commodity trading advisors, exempt commodity trading advisors are *not* required to provide a "disclosure document" to their clients or the National Futures Association. Registered commodity trading advisors must provide a "disclosure document" that includes a complete description of how the registered commodity trading advisor calculates fees, and when the fee is determined by reference to a base amount such as "gross profits" or "net profits," the document must explain how the base amount will be calculated. Therefore, by striking paragraph 2(c) from the indictment, the government relinquished the ability to present evidence and to argue that CFTC regulations required Mr. Buckley to calculate profits using a certain method and that Mr. Buckley had a regulatory duty to disclose the calculation of his fees in a "disclosure document."

12 – OPINION AND ORDER

### b)    No deviation from a provable baseline

Once it was established that Mr. Buckley had no regulatory duty to disclose his method of calculating profits and fees, the government needed to show a deviation from some provable baseline.  The government's expert testified to an industry standard, but the government also presented evidence of a different standard: the clients' understanding.  As I have explained, these standards were irreconcilable.  Stated simply, a calculation using the accrual method of accounting does not yield a figure equal to "the money that you can draw out of the account" in the context of commodities trading.The jury could not logically rest its verdict on irreconcilable standards, and because I cannot ascertain the basis of the verdict, it cannot stand.

Even if I assume the verdict was based solely on Mr. Tanner's industry standard, the logical chain fails.  There was no evidence that Mr. Buckley was under an actual burden to disclose that he was deviating from the industry standard, particularly in light of Mr. Tanner's testimony that the words he used in his agreement were not standard in the industry.

Outside of the regulatory context, the duty to disclose arises out of the idea that everybody knows what "total profits" means and if you deviate from what everybody knows it means, you are lying if you do not disclose the deviation.  But here, nobody knew what profit or total profits meant.  The government did not even present a consistent definition.   Therefore, the duty to disclose falls apart.

The government has expressed concern that my analysis of this case, if taken to the extreme, would mean that Mr. Buckley could say "total profits" and make up whatever number he wanted.[3]  I do not share that concern.  This is because we are not here to rescue contracts from

---

[3] As it turns out, even *registered* commodity trading advisors enjoy substantial freedom to set a calculation method for profits for the purpose of determining fees. *See* 17 C.F.R. § 4.34.  Defendant accurately points out in post-trial briefing that registered commodity trading advisors are allowed by regulations to follow a range of

poor drafting; we are here to determine criminal liability.  The problem the government

identified—that Mr. Buckley's clients had a different understanding of "total profits" than Mr.

Buckley did—may very well be a serious problem in terms of contract formation.  But to warrant

criminal liability, the government needed to prove some misrepresentation, and it missed the

mark.

　　　This case involved clients who were inexperienced in the commodities trading industry

turning over a substantial amount of their wealth to Mr. Buckley in the hopes that he would make

them significantly more money.  It didn't work out.  But Mr. Buckley did what he said he would

do.  He invested their money in a risky market.  He calculated his fees consistently, based on

accurate numbers provided by RJO.  Whether his fee calculation method was a misrepresentation

warranting criminal liability was the government's burden to prove.  Defendant used a method of

accounting to calculate "total profits."  Presenting evidence that two other (and mutually

exclusive) methods of accounting would have been "right" does not prove that what defendant

did was criminally wrong.

　　　I am deeply concerned that the jury could have relied on inconsistent meanings of the

term "total profits" to convict Mr. Buckley.  The government's entire theory of fraud rested on

the idea that there is a baseline of some kind from which Mr. Buckley deviated.  I find there was

no such baseline.  One was not proved at trial, nor is there one, and so he could not have deviated

from one.  Therefore, I GRANT defendant's motion for judgment of acquittal.

---

permissible ways to calculate profit for the purposes of determining their fees, as long as the calculation method is
explained to the investor.  (Supp. Mem. [200] at 5.)

II.     Amendment and Variance

I also hold that Mr. Buckley's conviction resulted from a constructive amendment to, and a fatal variance from, the original indictment.  This constitutes another reason to grant a judgment of acquittal.  It also serves as an independent reason to dismiss the indictment.

A.     *Legal Standard*

A constructive amendment of an indictment "occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." *United States v. Hartz*, 458 F.3d 1011, 1020 (9th Cir. 2006) (quoting *United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir. 1984)).  The Ninth Circuit "has found constructive amendment of an indictment where '(1) there is a complex of facts presented at trial distinctly different from those set forth in the charging instrument, or (2) the crime charged in the indictment was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved.'" *United States v. Mancuso*, 718 F.3d 780, 792 (9th Cir. 2013) (quoting *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002)).  A variance "occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *Hartz*, 458 F.3d at 1020 (quoting *Von Stoll*, 726 F.2d at 586).

Historically, a constructive amendment and variance were considered separate concepts; a finding of constructive amendment triggered automatic reversal, while a finding of variance did not. *See United States v. Jingles*, 702 F.3d 494, 501–02 (9th Cir. 2012).  This dichotomy is no longer followed in more modern cases. *See id.* at 500–02.  As the Ninth Circuit recently explained, "a 'constructive amendment' is simply one kind of 'variance'—that is, a variation in proof from the grand jury's charge." *Id.* at 501 (citing *Gaither v. United States*, 413 F.2d 1061,

1072 (D.C. Cir. 1969)). When "faced with a variation in proof from the grand jury's charge [,

the Court] must consider every way in which that variation might burden a defendant's

substantial rights." *Id.* "[A] variance requires reversal only if it affects the defendant's

substantial rights." *United States v. Doss*, 630 F.3d 1181, 1191 (9th Cir. 2011).

>        **B.**        *Analysis*

The concepts of constructive amendment and variance are both implicated in my

concerns about this case. First, the crime charged in the indictment was substantially altered at

trial, so that I find it is impossible to know whether the grand jury would have indicted for the

crime that the government actually sought to prove. Second, there was a variation in proof from

the grand jury's charge that I find greatly burdened Mr. Buckley's substantial rights.

As explained above, the language of the indictment included a paragraph that suggested

Mr. Buckley was subject to certain regulations. Presumably evidence to that effect was

presented to the grand jury. If, in fact, the government had proceeded to trial under a theory that

Mr. Buckley was subject to CFTC regulations, this would have been an entirely different case.

But the government agreed to strike the paragraph prior to trial, and proceeded to trial under a

theory that did not involve CFTC regulations. I find it is impossible to know whether the grand

jury would have indicted Mr. Buckley if it had not been presented with the evidence presumably

used to support the allegation that Mr. Buckley "held himself out as a commodity trading advisor

to the public and to his victims, even though he was not a registered commodity trading advisor."

A separate issue is that the indictment presumably started out with one explanation of

why the profit was "materially false and inflated" and, by the end of trial, the government had

presented at least two alternative theories, neither of which matched the language of the

indictment. The indictment, in relevant part, alleges that "the ICFG and ICT statements of

16 – OPINION AND ORDER

account calculated materially false and inflated monthly profits on the trading accounts that did not reflect the *actual profit realized* on the accounts during the relevant time period." (emphasis added). In addition, the indictment alleges that the "ICFG and ICT statements of account also calculated a 35% or 30% fee based on the materially false and inflated profit, not the *actual profit realized* on the accounts during the relevant time period." (emphasis added). Significantly, none of the named victims testified that they believed Mr. Buckley meant "actual profit realized" when he stated that he would calculate his fees based on "total profits." This divergence between the misrepresentation alleged in the indictment and the misrepresentation proved at trial is a variance that I find burdened Mr. Buckley's substantial rights.

In addition, as described above, inconsistent definitions of "total profits" were presented at trial, such that I have grave concerns that the jury could have relied on multiple meanings of the words in the indictment in order to convict. The grand jury must have settled on one meaning of the phrases involved. By the end of trial, however, the jury had heard evidence of multiple meanings that were inconsistent with one another.

For all of the above reasons, I hold that Mr. Buckley's conviction resulted from a constructive amendment to, and a fatal variance from, the original indictment. Therefore, his conviction cannot stand.

## III.   Motion for New Trial

In the alternative, Mr. Buckley is entitled to a new trial. The trial proceeded in such a way that I now conclude that a serious miscarriage of justice may have occurred. This is partly for the reasons I have already explained and partly because of the way the evidence of threats played out at trial.

### A.   *Legal Standard*

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. In considering a Rule 33 motion, "[t]he district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1211 (9th Cir. 1992) (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). "If the court concludes that . . . the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict.'" *Id.* at 1211–12 (quoting *Lincoln*, 630 F.2d at 1319.)

**B.**     *Analysis*

At trial, I allowed in somewhat sanitized evidence of Mr. Buckley's threats to his clients. Although I had obvious concerns under Federal Rule of Evidence 403, I found the evidence admissible under Federal Rule of Evidence 404(b) for the purpose of proving that Mr. Buckley knew he was making a misrepresentation. What I thought I was letting in was evidence that had probative value on a particular theory—proving scienter—and that was appropriately redacted to mitigate prejudice.

In my view, the actual use of the evidence expanded during the trial. At trial and even in the post-trial Rule 29 motion, the government relied on the threat evidence not only to prove scienter but also to prove misrepresentation itself: that is, not just to prove that he had the mental state of knowledge that his statements were false, but also to prove that the statements were in fact false. As I described above, the government's theory of misrepresentation was fatally flawed. Using the threat evidence to buttress the irreconcilable theories of misrepresentation greatly increased its prejudicial effect.

18 – OPINION AND ORDER

The government's argument is that a man who acts like he has lied is proof that there has been a lie. In a typical case, a similar issue may not raise such serious concerns. But in this case, it moves the threat evidence to the core of the case. It also becomes possible that the threat evidence was completely outcome determinative because it was being used to prove not one, but two, elements of the crime. These concerns are compounded because it is indisputable that Mr. Buckley's clients lost money and were the victims of a vitriolic stream of horrific verbal abuse. Such facts could have gone a long way towards leading the jury to a guilty verdict, even though the government needed to prove that Mr. Buckley's clientswere victims of his misrepresentation, not his verbal abuse.

By the end of trial, the calculus under Rule 403 had shifted. Ironically, the probative value of this evidence had gone up under Rule 403 in that the government relied on it even more heavily. But it was also true that the potential for unfair prejudice also went up dramatically and raised even greater concerns for me about its ability to influence the verdict. Therefore, I GRANT defendant's motion [152] for a new trial.

## CONCLUSION

This outcome will certainly be disappointing to those who lost substantial amounts of money through their dealings with Mr. Buckley. Their losses are real, whether Mr. Buckley acted illegally or not. But the general wrongfulness of Mr. Buckley's actions is not before me. For the reasons stated above, defendant's motion [151] for judgment of acquittal is GRANTED and defendant's motion [149] to dismiss the indictment is GRANTED. Alternatively, defendant's motion for a new trial [152] is also GRANTED.

IT IS SO ORDERED.

DATED this ___12th___ day of September, 2013.


/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge